**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**LEROY WESTON SMITH TUCKER,**

     **Plaintiff,**

**vs.**                          **Case No.  4:12-CV-3-RH/CAS**

**MICHAEL J. ASTRUE,
Commissioner of Social Security,**

     **Defendant.**

_____/


## REPORT AND RECOMMENDATION

      This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Commissioner of the Social Security Administration (SSA) denying Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and Supplemental Security Income (SSI) under Title XVI.  After careful consideration of the entire Record, it is recommended that the decision of the Commissioner be affirmed.

## I.  Procedural History of the Case

      On or about December 15, 2008, Plaintiff, Leroy Weston Smith Tucker, filed applications for a period of disability and DIB and SSI, alleging disability beginning November 23, 2005.  R. 13, 118-22.  (Citations to the SSA Record shall be by the symbol "R." followed by a page number that appears in the lower right corner.)  At the

hearing, Plaintiff amended his alleged onset date of disability to July 1, 2008.  R. 13, 29.

Plaintiff's date last insured or the date by which his disability must have commenced in

order to receive benefits under Title II (DIB) is December 31, 2008.  *Id*. at 13.

Plaintiff's application was denied initially on January 26, 2009, and upon

reconsideration on March 20, 2009.  *Id*. at 13, 49-52.  On April 14, 2009, Plaintiff filed a

request for hearing.  *Id*. 73-75.  On August 12, 2010, Plaintiff appeared and testified at a

hearing conducted by Administrative Law Judge (ALJ) Aaron M. Morgan in Tallahassee,

Florida.  *Id*. at 21.  Mark Capps, an impartial vocational expert, testified during the

hearing.  *Id*. at 13, 25, 43-44, 83 (Resume).  Plaintiff was represented by Joe G. Durrett,

an attorney.  *Id*. at 13, 22, 24.

On September 22, 2010, the ALJ issued a Decision denying Plaintiff's

applications for benefits.  *Id*. at 13-21.  On October 29, 2010, Plaintiff filed a request for

review.  *Id*. at 8-9.  The Appeals Council received supplemental evidence dated June

19, 2011, referred to as exhibit 15F.  *Id*. at 4, 401-03.  On December 19, 2011, the

Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final

decision of the Commissioner.  *Id*. at 1-5.

On January 3, 2012, Plaintiff filed a complaint pro se with the United States

District Court seeking review of the ALJ's decision.  Doc. 1.  Plaintiff is represented by

an attorney.  The parties filed memoranda of law, docs. 18 and 23, and those have

been considered.

## II. Findings of the ALJ

The ALJ made several findings relative to the issues raised in this appeal.

1. Plaintiff "was born on September 28, 1954 and was 53 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date." R. 20.

2. Plaintiff "meets the insured status requirements of the Social Security Act through December 31, 2008." *Id.* at. 15.

3. Plaintiff "has not engaged in substantial gainful activity since July 1, 2008, the [amended] alleged onset date." *Id.*

4. Plaintiff has several severe impairments: "hepatitis C; hemochromatosis; mild cardiovascular impairment; kidney cysts." *Id.*

5. Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* at 15-16.

6. Plaintiff has the residual functional capacity (RFC) "to perform a full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c)." *Id.* at 16.

7. Plaintiff "is unable to perform any past relevant work." *Id.* at 19.

8. Plaintiff "has at least a high school education and is able to communicate in English." *Id.* at 20.

9. "Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of 'not disabled,' whether or not the claimant has transferable job skills." *Id.*

10. "Considering the [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform" such as a "full range of medium work," and "a finding of 'not disabled' is directed by Medical-Vocational Rule 203.22." *Id.* at 20.

11. Plaintiff "has not been under a disability, as defined in the Social Security act, from July 1, 2008, through the date" of the ALJ's decision. *Id.*

### III. Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.

42 U.S.C. § 405(g); Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986). "Substantial

evidence is more than a scintilla, but less than a preponderance. It is such relevant

evidence as a reasonable person would accept as adequate to support a conclusion."

Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); accord

Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). "The Commissioner's factual

findings are conclusive if supported by substantial evidence." Wilson v. Barnhart, 284

F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[1]

"In making an initial determination of disability, the examiner must consider four

factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining

physicians; (3) subjective evidence of pain and disability as testified to by the claimant

and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'" Bloodsworth, 703 F.2d at 1240 (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

---

[1] "If the Commissioner's decision is supported by substantial evidence we must
affirm, even if the proof preponderates against it." Phillips v. Barnhart, 357 F.3d 1232,
1240, n.8 (11th Cir. 2004) (citations omitted). "A 'substantial evidence' standard,
however, does not permit a court to uphold the Secretary's decision by referring only to
those parts of the record which support the ALJ. A reviewing court must view the entire
record and take account of evidence in the record which detracts from the evidence
relied on by the ALJ." Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).
"Unless the Secretary has analyzed all evidence and has sufficiently explained the
weight he has given to obviously probative exhibits, to say that his decision is supported
by substantial evidence approaches an abdication of the court's 'duty to scrutinize the
record as a whole to determine whether the conclusions reached are rational.'" Cowart
v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1509 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212 (2002).  In addition, an individual is entitled to DIB if he or she is under a disability prior to the expiration of his or her insured status.  *See* 42 U.S.C. § 423(a)(1)(A) and (d); Torres v. Sec'y of Health & Human Servs., 845 F.2d 1136, 1137-38 (1st Cir. 1988); Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986).

The Commissioner analyzes a claim in five steps.[2]  20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v) require consideration of the following factors:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairments?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent other work?

---

[2]  In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI.  Separate, parallel statutes and regulations, however, exist for DIB and SSI claims (*see* 20 C.F.R. §§ 404, 416).

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.  If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience.  Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. §§ 404.1520(a)(4)(v), (e) & (g); 416.920(a)(4)(v), (e) & (g).  If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  Evidence from the Administrative Hearing

### A.  Leroy Weston Smith Tucker (Plaintiff)

Mr. Tucker testified during the administrative hearing.  R. 26-45.  Mr. Tucker's counsel agreed to limit or amend the alleged onset date to July 1, 2008, id. at 29, after discussing some of Plaintiff's prior employment and some of his earnings in 2008 when he earned approximately $7,000, id. at 27-29, 128, 134.  Mr. Tucker explained that he has not worked since July 1, 2008, because he is "hurting" as he "constantly [has] migraine headaches."  Id. at 29.  The ALJ asked Mr. Tucker's counsel whether "there

[is] any sort of a non-exertional impairment alleged here," and counsel responded, "No,

Your Honor." *Id.* at 37. As of the hearing, Mr. Tucker was not taking any type of mental

medication, but he was scheduled to see a psychologist through assistance he expects

to receive from the Bond Clinic. *Id.* at 37-38.

The ALJ summarized Mr. Tucker's testimony:

At the hearing, claimant testified that his body hurts so much that he could not walk. He said he had constant migraine headaches, right-sided pain from scar tissue on his liver, and pain from the cysts on his kidneys. He stated that he used no medication for his kidney cysts. He reported that he experienced chronic fatigue and nausea from his hepatitis C condition and treatment. He said that his medications help, but that he could not work all day because of his pain and fatigue. He reported that his medication caused constant pain in his head.

The claimant testified that he last worked in 2008 in a work-release program associated with his incarceration. He stated that he worked at a restaurant and that his hours were reduced because he could not lift the pots and pans. He said that since his release from prison, he had lived with his parents and said that he stayed around the house and read a lot. He reported that he didn't help much around the house, only occasionally helping wash the dishes, because his body would not let him do more. He testified that he attended a hepatitis support group meeting once a month. He reported that he could lift 15 pounds with each arm, sit for several hours at one time, and walk ¼ mile.

*Id.* at 16. *See id.* at 17-18 (ALJ comparing Mr. Tucker's hearing testimony with the

medical evidence).

In addition, Mr. Tucker testified that he has a Florida driver's license, is able to

drive, and drove to the hearing site. *Id.* at 26. He graduated from high school, attended

some college, and can read and write. *Id.* at 27.

Mr. Tucker stated that after walking "about a quarter of a mile," he would have to

stop because his feet would hurt "real bad." *Id.* at 34. He can stand for "[p]robably

about two hours." *Id.*

Mr. Tucker described some of his interactions with his physicians. *Id.* at 30-40.

In response to his counsel's questions, Mr. Tucker stated that if someone offered him a job where he would have to primarily stand during the day, he "couldn't do it" because his "feet hurt to[o] bad" and he would also get tired.  *Id.* at 43.  Mr. Tucker also stated that when he gets hot, his head "hurt[s] real bad."  *Id.* at 44.

### B.  Mark Capps (Vocational Expert)

Mr. Capps testified, without objection, as an impartial vocational expert.  *Id.* at 15, 43-44.  Mr. Capps was present for Mr. Tucker's testimony.

Mr. Capps reviewed Plaintiff's work history in "construction work," which is "listed as a heavy occupation with an SVP of 4."  *Id.* at 44; *see id.* at 136 (work history), 188 (Work Experience Summary: Job Title (Construction Worker I); DOT # (869.664-014); DOT Exertional Level (Heavy); DOT Skill Level (SVP 4); Acquired Skills (none to light/sedentary)).  The ALJ inquired: "Now, as far as transferrable skills, that's – are there any or is that just a pretty job specific skills that you're talking about there?"  Mr. Capps responded: "No light or sedentary skills that really – that, you know, we can talk about some medium jobs, but that would be the limit."  Plaintiff's counsel did not question Mr. Capps.  *Id.* at 44.

### C.  Medical Evidence that Pre- and Post-Dates July 1, 2008 (Amended Alleged Onset Date)

During the night of February 21, 2008, Plaintiff was examined in an observation bed at Tallahassee Memorial Hospital (TMH), complaining of chest pain.  R. 276. Samantha Mckay, M.D., conducted a physical examination and history of Plaintiff's illnesses.  *Id.* at 277.  Plaintiff was "residing at the work release center as he is incarcerated" and working at Popeye's Chicken.  *Id.* at 278.  Plaintiff reported chest pain lasting 3 to 4 seconds with a severity of 7 out of 10.  *Id.*  Plaintiff described it as "an

electric shock with no radiation." *Id.* Plaintiff "also complained of some left-sided calf swelling and tenderness, but no pedal edema." *Id.* Plaintiff denied, in part, nausea, vomiting, and dizziness. *Id.* Dr. Mckay diagnosed Plaintiff as suffering from, *inter alia,* chest pain, ruled out myocardial infarction, shortness of breath, elevated cholesterol, elevated liver function test (although the source was unknown), and "possible iron deficiency anemia." *Id.* at 278-79; *see id.* at 225-26 (two negative diagnostic reports).

On February 22, 2008, Plaintiff was discharged from the hospital. *Id.* at 280. Judit T. Sule, M.D., indicated that Plaintiff's primary discharge diagnoses were atypical chest pain, cardiomegaly with dilated left ventricle, and hemochromatosis. *Id.*[3]

On April 5, 2008, Plaintiff followed up with Damon Cooper McMillan, M.D. (at Bond Community Health Center (Bond)), after hospitalization the previous February "for liver concerns and elevated blood pressure." *Id.* at 202, 397. Plaintiff reported taking metoprolol 25 mg twice a day with no complaints. Vital signs were stable. Dr. McMillan diagnosed Plaintiff as suffering from hypertension with bradycardia and prescribed enalapril 5 mg a day. *Id.*

On May 23, 2008, Plaintiff treated with Edwardo Williams, M.D. (at Bond). *Id.* at 201. Plaintiff reported a history of hypertension, hemochromatosis, cardiomegaly, and complained of some occasional abdominal pain. *Id.* Plaintiff had no blurry or double vision, shortness of breath, PND, or orthopnea and had no GU symptoms. Dr. Williams noted that Plaintiff had right upper quadrant discomfort in the abdomen, and that

---

[3] During his stay at TMH, several studies were performed: myocardial perfusion imaging study (borderline abnormal myocardial perfusion study with mildly dilated left ventricle); CT pulmonary angiogram/venogram (no pulmonary embolism or deep vein thrombosis-negative for acute cardiopulmonary abnormality); and frontal view of chest compared with CT pulmonary arteriography and CT scan of thorax (normal heart size and clear lungs-no acute findings). *Id.* at 282-84.

Plaintiff's "liver seems to be slightly enlarged," with no "left-sided discomfort at his particular time." *Id.* Dr. Williams assessment included hemochromatosis, symptomatic at this time with abdominal pain; hypertension, stable; and "cardiomegaly may be secondary to the hemochromatosis." *Id.* Dr. Williams prescribed enalapril 5 mg once daily. *Id.*

On May 27, 2008, an ultrasound of Plaintiff's abdomen revealed hepatomegaly and a "4 cm cystic lesion with septation in the lower pole of the left kidney. Renal cell carcinoma is not excluded and either surveillance ultrasound or dynamic CT are suggested for subsequent evaluation." *Id.* at 191, 229.

On June 20, 2008, a CT scan of Plaintiff's abdomen revealed a "simple right renal cyst" measuring 2.0 cm, and a "left renal cyst with fine septations," that did "not enhance and appears benign." *Id.* at 190.

On July 1, 2008, Plaintiff referred to Hematology Oncology Associates of Northwest Florida, L.L.P., (HOA) for hepatitis C and elevated iron studies. *Id.* at 196. He was examined and treated by Marie M. Amanze, M.D. *Id.* After physical examination and review of laboratory results, Dr. Amanze assessed that Plaintiff had hepatitis C and elevated iron. Dr. Amanze doubted that Plaintiff "has hereditary hemochromatosis." *Id.* at 197.

On July 11, 2008, Plaintiff was referred to C. Raymond Cottrell, M.D. (Digestive Disease Clinic), with a complaint of hepatitis C. *Id.* at 218.[4] Plaintiff reported headache,

---

[4] On December 18, 2008, the Florida Department of Health (DOH) sent a fax to the Digestive Disease Clinic, Medical Records, requesting, in part, "a detailed narrative report and/or copies of your office records as described below. The information you submit is important to our determination because you, as a treating source, can provide details not available from any source." *Id.* at 211. The request also stated: "If you provide a narrative report, please include summary notes of the patient's medical

difficulty breathing, and chest pain. *Id.* at 219. Plaintiff denied fatigue. *Id.* Dr. Cottrell diagnosed Plaintiff as having hepatitis C, abnormal liver function tests, hemochromatosis, and cardiomyopathy, secondary not otherwise specified. *Id.* at 221. Dr. Cottrell noted that Plaintiff's abnormal liver tests "could either be due to his hepatitis C, iron overload if not hemochromatosis, and/or fatty liver from alcohol use in the past." Clarification was needed regarding the lesions seen on Plaintiff's kidney as well as conflicting data related to his iron overload or hemochromatosis. Additional studies were recommended. *Id.*

On July 22, 2008, Dr. Amanze diagnosed Plaintiff as suffering from "mild leukopenia and also a mildly low MCV which I think may be from anemia of chronic disease due to his hepatitis C and also some splenic sequestration." *Id.* Dr. Amanze referred Plaintiff to a digestive disease clinic. *Id.* (Plaintiff was also seen at Bond by Cynthia Evans, ARNP, for evaluation and management of hypertension (noted as stable, alert, oriented, and no deficits with recall or memory) and benign prostatic hyperplasia (BPH). *Id.* at 286.)

On July 23, 2008, an echocardiogram with Doppler revealed moderate diastolic dysfunction with mild left ventricular hypertrophy, mild reduction in left ventricular systolic function, and trivial valvular leaks. *Id.* at 230. Also, on July 23, 2008, a CT

history, clinical and laboratory findings, treatment and response, diagnosis, prognosis; as well as your opinion, based on your medical findings, the patient's ability, despite the limitations imposed by impairment(s), to perform certain activities. FOR AN ADULT: When providing a narrative summary, please address the patient's ability to do work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling; and to do work-related mental activities involving understanding and memory, sustained concentration and persistence, social interaction, and adaptation. *Id. See id.* at 193 (similar request sent to Hematology-Oncology Associates, Medical Records). Both healthcare providers sent many patient notes regarding Plaintiff's medical history to DOH and they are discussed herein. No treating physician provided a narrative report per se discussing Plaintiff's work-related abilities.

abdomen and pelvis scan revealed an unremarkable study of Plaintiff's abdomen and pelvis. *Id.* at 223, 275.

On August 14, 2008, Dr. Cottrell examined and treated Plaintiff. *Id.* at 215. Dr. Cottrell noted that Plaintiff's hepatitis C "appears to be longstanding and his liver does not appear to be small or shrunken although the spleen is of generous size. This could indicate some underlying fibrosis or cirrhosis. The iron levels can be elevated with C but not to this level." *Id.* at 217. Dr. Cottrell also noted regarding hemochromatosis that "this is gene negative hemochromatosis by definition of the elevated ferritin and saturation numbers over 90%. All of this may not effect his hepatitis C treatment, it probably deserves treatment first. This could have implications for his cardiomyopathy or his alcohol use in the past could explain his cardiomyopathy." *Id.* at 217. Phlebotomy was performed for hemochromatosis (to lower iron levels). Further cardiac evaluation would be considered. *Id.*

On August 18, 2008, Dr. Williams noted Plaintiff was under the care of a specialist. *Id.* at 200. Plaintiff reported no blurred or double vision, shortness of breath, PND, or orthopnea and also reported that abdominal pain is improved, although Plaintiff reported some muscle pain on his right side. His blood pressure was "much improved" and weight stable. *Id.*

On August, 19, 2008, a liver biopsy revealed "chronic active hepatitis, Batts and Ludwig grade 3, stage 2. Marked hepatocyte siderosis (4+) consistent with hemochromatosis. Steatosis, 25% (by area)." *Id.* at 228, 274 (ultrasound-guided liver biopsy).

On November 11, 2008, Dr. Cottrell treated Plaintiff for hemochromatosis and hepatitis C. *Id*. at 212. Plaintiff complained of some left-sided pain. Dr. Cottrell noted that it is really related to position change and probably musculoskeletal pain by physical exam. *Id*. (Plaintiff was reported as a "no show" for his November 10, 2008, visit at Bond. *Id*. at 203.) Dr. Cottrell diagnosed Plaintiff with musculoskeletal pain of incidental nature and not related to any internal organ; hemochromatosis undergoing phlebotomy; hepatitis C, which "is stable." "He knows he is not even a candidate for treatment until we get his iron under control and even then his cardiomyopathy although not bad may limit us. That will be a decision made in the future. We will see him back pending lab studies." *Id*. at 214. Plaintiff was alert, cooperative, not in acute distress, oriented x4, well nourished and well developed. *Id*. at 213; *see id*. at 216, 220.

In January 19, 2009, Robert Steele, M.D., a State agency, non-examining medical consultant, completed a Physical Residual Functional Capacity Assessment. *Id*. at 241-48. Dr. Steele determined that Plaintiff could lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; and rated Plaintiff as "unlimited" regarding ability to push and/or pull other than is noted for lift and/or carry. *Id*. at 242. Dr. Steele explained the evidence that supported these conclusions, including mentioning that Plaintiff had hepatitis C with no related symptoms. *Id*. Dr. Steele noted that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. *Id*. at 243-45. Plaintiff's symptoms were attributable to a medically determinable impairment and the severity of the symptoms and its alleged effect on function was consistent with the total medical and

nonmedical evidence. *Id.* at 246. No medical source statements regarding Plaintiff's physical capacities were in the file. *Id.* at 247; *see id.* at 19 (ALJ's discussion of these conclusions).

On March 4, 2009, Plaintiff presented to TMH stating that his left kidney cyst was bothering him. *Id.* at 266-73. (Popeye's Chicken is listed as "guarantor employer." *Id.* at 266.) Plaintiff reported a constant pain score of 7 in his left flank. *Id.* at 268. Plaintiff was diagnosed having abdominal pain not otherwise specified. *Id.* at 273.

On March 18, 2009, Bettye Stanley, D.O., a State agency, non-examining medical consultant, completed a Physical Residual Functional Capacity Assessment. *Id.* at 249-56. Dr. Stanley determined that Plaintiff could lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; and rated Plaintiff as "unlimited" regarding ability to push and/or pull other than is noted for lift and/or carry. *Id.* at 250. Dr. Stanley explained the bases for her conclusions. *Id.* Dr. Stanley did not find the Plaintiff had any postural, manipulative, visual, communicative, or environmental limitations. *Id.* at 251-53. No medical source statements regarding Plaintiff's physical capacities were in the file. *Id.* at 255; *see id.* at 19 (ALJ's discussion of these conclusions).

On May 13, 2009, Plaintiff treated with Nurse Practitioner Evans, for evaluation and management of hypertension, chest pain, and left flank pain. *Id.* at 287. (It was noted that he had last been seen at Bond in August 2008, but followed by the digestive disease clinic. *Id.*) Plaintiff reported that he occasionally has headaches and "what

feels like sharp pains in his head." *Id.* Plaintiff Nurse Practitioner Evans' assessment was: hypertension, chronic hepatitis C, and cardiomyopathy. *Id.* Plaintiff's dose of enalapril was increased to 10 mg daily. *Id.* No acute distress or deficits with recall or memory were noted. *Id.*

A June 12, 2009, note from Dr. Cottrell stated that the iron studies were coming down with phlebotomy. *Id.* at 297.

On June 16, 2009, Plaintiff presented to TMH after complaints of spitting up blood, shortness of breath, occasional night sweats, gaining weight, and numbness that is persistent in the left arm. *Id.* at 260-61, 264. Plaintiff had paresthesia of the left arm and hemoptysis. *Id.* at 265.

On July 10, 2009, a renal ultrasound with color Doppler of Plaintiff was an unremarkable study with normal kidneys and cysts bilaterally. *Id.* at 258.

On July 16, 2009, Plaintiff treated with Bryan A. Spooner, D.P.M., for an initial office visit. *Id.* at 317. Plaintiff reported symptoms of claudication, and x-rays "show mild degenerative changes at the talonavicular joint, "but no acute findings. No erythema or edema." *Id.* Dr. Spooner noted that Plaintiff's arterial Doppler would be checked.

On July 22, 2009, Nurse Practitioner Evans treated Plaintiff for hypertension and BPH. *Id.* at 286. After examination, Nurse Evans noted that Plaintiff needed to follow-up with urology for Flomax, and Plaintiff was given refills for enalapril. *Id.* at 286. (Plaintiff was reported as a "no show" for a July 24, 2009, appointment. *Id.* at 288.)

On July 29, 2009, imaging of Plaintiffs lower extremities revealed "probably moderate disease in the distribution of the right anterior tibial artery" and "negative duplex arterial evaluation of the left leg." *Id.* at 316, 385.

On August 11, 2009, Plaintiff was examined and treated by Dr. Cottrell. *Id.* at 292-94, 356-57. Plaintiff "is clinically asymptomatic, but does carry a diagnosis of hepatitis C." *Id.* at 292. "The compounding problem is that he carried the diagnosis of possibly cardiomyopathy but we do not have a documentation of that. Because of his insurance status he has not been able to see the cardiologist for follow up, but clinically has been doing well." *Id.* Plaintiff was alert, cooperative, oriented x4 and not in acute distress. *Id.* Plaintiff's abdomen was soft and non-distended with no tenderness or guarding with palpation. *Id.* at 292, 321. Dr. Cottrell diagnosed Plaintiff as having hepatitis C and hemochromatosis. *Id.* at 293. Dr. Cottrell noted that Plaintiff's hepatitis C is stable at the present time. "He is genotype 1 and has a high viral load. We have never done a Fibrosure on him. Because of his cardiac status and his iron overload he is not a candidate for treatment. With his age, his race, his genotype and his viral load, he is not a great candidate for a response of greater than 25% to even a year of therapy." *Id.* Dr. Cottrell further noted: "If, indeed, it appears he is a candidate I would draw a Fibrosure on him because I would look for every reason not to treat this gentleman because of his low response rate and high complication rate." *Id.*

On October 16, 2009, Plaintiff had lower peripheral artery testing. *Id.* at 314. There was no evidence of significant peripheral arterial disease of the right and left legs. *Id.*

On October 25, 2009, Plaintiff presented to the emergency department at Capital Regional Medical Center (Capital) complaining of chest pain for six months. *Id.* at 366-84. A CT scan of Plaintiff's chest with contrast revealed, as an impression: "Coronary arterial calcification otherwise normal CT chest for age. Lungs are clear." *Id.* at 383.

On October 26, 2009, an echocardiogram revealed that Plaintiff was "bradycardic throughout study." "Otherwise normal 2-D M-mode echocardiogram with Doppler study revealing mild mitral regurgitation and trace to mild tricuspid regurgitation." *Id.* at 367. *See also id.* at 368.

On December 10, 2009, Plaintiff was examined by Dr. Cottrell, a regularly scheduled 3-4 month visit. *Id.* at 349. Plaintiff stated "he's had some left-sided chest pain when he picked up a tire and I've reassured him that this is not due to his liver disease." *Id.* Plaintiff reported being seen at Capital two weeks ago for left-sided pain and that he had a cardiac evaluation. *Id.*

On January 6, 2010, Nurse Practitioner Evans noted that Plaintiff was at Bond for evaluation and management of hepatitis C and hypertension. Nurse Evans noted, in part: "Otherwise, he is complaining of a little pain in the upper abdomen. He did admit to lifting a heavy tire and changing his tire. No other complaints are offered at this time." Diagnostic blood work was improved, normal, or essentially normal. *Id.* at 391.

On January 22, 2010, Plaintiff had a left heart cardiac catheterization, coronary angiography, and left ventriculogram. *Id.* at 362. The impression of William C. Dixon, IV, M.D., F.A.C.C., Tallahassee Cardiology Associates, P.A., was: no significant obstructive coronary artery disease; left ventricular systolic function is lower limits of normal with an estimated ejection function of 50-55%. *Id.* at 363. Recommendations

included: would consider alternative cause of chest pain; would also continue aggressive risk factor modification. *Id.*

On February 5, 2010, Dr. Dixon stated that from a cardiac standpoint, Plaintiff was cleared for any hepatitis C treatments that are needed at this time. *Id.* at 347.

On February 23, 2010, Plaintiff treated with Dr. Cottrell. *Id.* at 344. Plaintiff presented with chronic hepatitis C. *Id.* Dr. Cottrell stated: "His liver biopsy is a 2-3 in terms of inflammation and fibrosis. He's had this for over 20-30 years due to IV needles. He also has a high viral load and he is African American and all of these are negative events for him. This is discussed in detail with him today in terms of the plusses and minuses of pursuing treatment. I believe his overall response rate if he is a responder is probably going to be in the 20-25% range as opposed to the 45-50% range for non-African-Americans. Despite this, he wishes to go ahead." *Id.* After examination, Dr. Cottrell diagnosed Plaintiff having hepatitis C, "complicated by cardiac and hemochromatosis, the latter of two of which are now under control." *Id.* at 345.

On May 28, 2010, Plaintiff treated with Dr. Cottrell. *Id.* at 323; *see id.* at 388. Dr. Cottrell noted that Plaintiff had "been started on Pegasys for hepatitis C, but his ANC immediately dropped to less than 1,200. In the last two weeks it was 700 and 900, but we kept going." *Id.*; *see id.* at 340-41. Plaintiff was diagnosed as having chronic hepatitis C with medication side effects of neutropenia. *Id.* at 324. Pegasys was discontinued to "allow his white count to return to normal over the next several weeks." *Id.*

On June 11, 2010, Plaintiff treated with Dr. Cottrell for chronic hepatitis C. *Id.* at 320. Plaintiff "became severely neutropenic" and therapy had to be stopped. *Id.* His ANC has elevated from 400 to 700 to 800. *Id.* "Clinically, he's had no problems with fever, chills, any coughs, dysuria, abdominal pain, etc." *Id.* Plaintiff was diagnosed with chronic hepatitis C and "drug-induced neutropenia resolving at present." *Id.* at 321. Dr. Cottrell stated, "We'll check CBC on a weekly basis and then b[i]-weekly until the white count normalizes." *Id.* From a neurologic standpoint, Plaintiff's mental status was normal. *Id.*

On June 10, 2011, Debra Garrison, LPN, "Office Nurse" for Dr. Cottrell, noted that Plaintiff's "recommendations for treatment include monthly therapeutic phlebotomies and periodic monitoring of lab values. He will be required to continue this course of therapy indefinitely to prevent damage to his liver from iron overload." *Id.* at 402. (This patient note was supplied after the ALJ's Decision. *Id.* at 4.)

**V. Legal Analysis**

**A. Whether the ALJ erred in not requesting an opinion from Dr. Cottrell regarding Plaintiff's limitations**

Plaintiff argues that the ALJ erred because he did not request an opinion from Dr. Cottrell, or any other treating physician, regarding Plaintiff's abilities in light of Plaintiff's impairments. Doc. 18 at 11-13. No reversible error has been shown.

Plaintiff was examined and treated by Dr. Cottrell at the Digestive Disease Clinic for hepatitis C and hemochromatosis from July 11, 2008, to June 11, 2010. The record includes Dr. Cottrell's (and his staff's) detailed patient notes. R. 212-22, 292-94, 297, 320-24, 344-46, 349-57, 402. The record also includes patient notes from other medical sources, including hospitals (TMH and Capital); physicians, Drs. McMillan and Williams

(Bond), Dr. Amanze (HOA); Nurse Practitioner Evans (Bond); Dr. Spooner (Tallahassee

Podiatry); and Dr. Dixon (cardiologist).[5]

Plaintiff, as the claimant, bears the burden of proving that he is disabled, and

consequently, is responsible for producing evidence in support of his claim.  *See* 20

C.F.R. §§ 404.1512(a), 416.912(a); Moore v. Barnhart, 405 F.3d at 1211.  On the other

hand, an ALJ has a clear duty to fully and fairly develop the administrative record.

20 C.F.R. §§ 404.1512(d), 416.912(d); Brown v. Shalala, 44 F. 3d 831, 934 (11th Cir.

1995).  The question here is whether there are "the kinds of gaps in the evidence

necessary to demonstrate prejudice to" Plaintiff.  Graham v. Apfel, 129 F.3d 1420, 1422

(11th Cir. 1997).

According to the provisions in 20 C.F.R. §§ 404.1513(b)(1)-(5), 416.913(b)(1)-(5),

medical reports should include medical history, clinical and laboratory findings,

diagnoses, and treatment prescribed with response and prognosis.  The SSA Record

contains this information.  The CFR provisions further state:

> (6) A statement about what you can still do despite your impairment(s) based on the acceptable medical sources findings on the factors under paragraphs (b)(1) through (b)(5) of this section (except in statutory blindness claims).  *Although we will request a medical source statement about what you can still do despite your impairment(s), a lack of the medical source statement will not make the report incomplete.*  See § 404.1527 [§ 416.927].

20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6) (emphasis added).

On December 18, 2008, the Commissioner, by and through DOH, requested the

Digestive Disease Clinic (Dr. Cottrell's place of practice) to furnish a detailed narrative

report and/or copies of their office records as described in the request.  R. 211; *see*

---

[5]  The patient records of Dr. Cottrell and the other medical sources provide a detailed, longitudinal picture of Plaintiff's impairments.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

*supra* n.4, at 10-11. Detailed examination and treatment patient notes for almost two years were provided.

The Commissioner fulfilled his responsibility by requesting a narrative report and medical records from Dr. Cottrell, but the Commissioner cannot force Dr. Cottrell to provide a narrative statement and the lack of such a statement in the record does not make the record incomplete. *See* 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6). Although the ALJ has an affirmative duty to develop a full and fair record, the lack of a narrative report in this case does not "show the kind of gaps in the evidence necessary to demonstrate prejudice." Graham, 129 F.3d at 1422.[6]

## B. Whether the ALJ erred in determining that Plaintiff had the RFC to perform a full range of medium work

The ALJ found Plaintiff retained the RFC to perform the full range of medium work is defined in 20 C.F.R. §§ 404.1567c), 416.967(c). Plaintiff argues that the ALJ's determination is not supported by substantial evidence. Plaintiff argues that the ALJ erred in relying on the opinions of two state agency non-examining

---

[6] *Compare* Barker v. Astrue, No. 4:11-cv-0070-MP/CAS (N.D. Fla. Sept. 11, 2012) (Barker) (Doc. 31), *adopted*, (N.D. Fla. Sept. 27, 2012) (Doc.32). In Barker, the decision of the Commissioner was reversed, in part, because the ALJ did not contact the claimant's treating and specialist physician (in rheumatology) after the Commissioner's examining medical consultant recommended that the Commissioner "get a current evaluation from Dr. Staud of Shands Hospital [regarding] what is her current status [for] work activities." Doc. 31 at 26. In Barker, the medical evidence indicated that the claimant had been examined and treated by Dr. Staud on numerous occasions, both prior to and after the medical consultant's examination and evaluation, although there were only two series of patient notes for two separate dates, over a two-year period from Dr. Staud. *Id*. at 46. Also, another treating physician and specialist physician (in rheumatology) opined, in part, that the claimant was disabled and another treating physician, albeit not a specialist, also opined that the claimant was disabled. *Id*. at 31-33. Here, the ALJ stated: "As for the opinion evidence, the record does not contain any opinions from treating or examining physicians indicating the claimant is disabled or even has limitations greater than those determined in this decision." R. 19.

physician/consultants who opined that Plaintiff retained the ability to perform medium work. Doc. 18 at 13-14.

Residual functional capacity is the most a claimant can still do despite limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is an assessment based upon all relevant evidence including a claimant's description of his limitations, observations by treating and examining physician's or other persons, and medical records. *Id.* The responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c).

The ALJ found that Plaintiff has several "severe impairments: hepatitis C; hemochromatosis; mild cardiovascular impairment; [and] kidney cysts" "because they cause more than a minimal limitation in the claimant's ability to perform basic work activities." R. 15. After consideration of the evidence, the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of the symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." *Id.* at 16-17.

The ALJ made the RFC determination after a "careful consideration of the entire record area." *Id.* at 16. In making his determination, the ALJ considered Plaintiff's hearing testimony and the "longitudinal evidence of record," which is well-described in the Decision, *id.* at 16-19. The ALJ addresses each of Plaintiff's impairments in light of the medical evidence and Plaintiff's testimony. *Id.* at 17-19. "As for the opinion evidence, the record does not contain any opinions from treating or examining

physicians indicating the claimant is disabled or even has limitations greater than those determined in this decision." *Id.* at 19.

At this point in the Decision, the ALJ discusses the opinions of the State agency medical consultants, Drs. Steele and Stanley. *Id.* at 19. Although Plaintiff correctly noted that the opinions "were rendered without the benefit of all the records," doc. 18 at 14, and the ALJ noted that these consultants did not examine Plaintiff, the ALJ independently evaluated the record and determined that these opinions were consistent with the record as a whole. R. 19. The ALJ, relying on Social Security Ruling 96-6p, also noted that the opinions "regarding the nature and severity of an individual's impairments must be treated as expert opinion evidence from non-examining sources." *Id. See* 20 C.F.R. §§ 404.1513(c), 404.1527(e)(2)(i)-(iii), 416.913(c), 416.927(e)(2)(i)-(iii). The ALJ's RFC determination is supported by substantial evidence.

## C. Whether the ALJ erred in determining Plaintiff's credibility

Plaintiff argues that the ALJ's credibility determination is not supported by substantial evidence. Doc. 18 at 14-18. R. 16, 19. The ALJ considered Plaintiff's complaints he described during the hearing and as recorded in the medical evidence. R. 16-19. The ALJ's credibility determinations are supported by substantial evidence.

The credibility of the claimant's testimony must be considered in determining if the underlying medical condition is of a severity which can reasonably be expected to produce the alleged pain. Lamb v. Bowen, 847 F.2d 698, 702 (11th Cir. 1988). After considering a claimant's complaints of pain, an ALJ may reject them as not credible. *See* Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Wilson v. Heckler, 734 F.2d 513, 517 (11th Cir. 1984)). If an ALJ refuses to credit subjective pain

testimony where such testimony is critical, the ALJ must articulate specific reasons for questioning the claimant's credibility. *See* <u>Wilson,</u> 284 F.3d at 1225. Failure to articulate the reasons for discrediting subjective testimony requires as a matter of law, that the testimony be accepted as true. *Id.*

Pain is subjectively experienced by the claimant, but that does not mean that only a mental health professional may express an opinion as to the effects of pain. One begins with the familiar way that subjective complaints of pain are to be evaluated:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

<u>Wilson</u>, 284 F.3d at 1225. *See* 20 C.F.R §§ 404.1529; 416.929 (explaining how symptoms and pain are evaluated); 404.1545(e); 416.945(e) (regarding RFC, total limiting effects). This is guidance for the way the ALJ is to evaluate the claimant's subjective pain testimony because it is the medical model, a template for a treating physician's evaluation of the patient's experience of pain.

As noted above, the ALJ reviewed each of Plaintiff's complaints claims in light of his testimony and the medical evidence, R. 16-19, and concluded: "Despite disabling limitations in his exertional capacities and stamina, the record provides no convincing evidence over time, and the undersigned cannot find the testimony and alleged limitations of the claimant to be well supported by the evidence of record." *Id.* at 19.

For example, despite Plaintiff's complaint of migraine headaches, *see, e.g., id.* at 28, the record does not show any specific diagnosis or treatment for migraine headaches. *Id.* at 17. Treatment records from Plaintiff's medical providers showed only

reports of occasional headaches. *See, e.g., id.* at 17-18, 219 (Dr. Cottrell), 287 (Nurse Practitioner Evans). Plaintiff reported a history of cardiomegaly, but medical records show that he was doing well from cardiac standpoint. *Id.* at 17, 347, 363. Dr. Dixon evaluated Plaintiff and noted a normal heart size, no significant coronary artery disease, although his left ventricle systolic function is lower limits of normal. *Id.* at 17, 263 ("would consider alternative causes of chest pain"). Peripheral arterial testing of Plaintiff's legs showed no significant peripheral artery disease. *Id.* at 17, 314.

Plaintiff complained of pain from cysts on his kidneys. *Id.* at 36-37. Plaintiff's treating physicians, however, did not recommend any treatment or further evaluation of Plaintiff's kidney cysts. *Id.* at 17, 258 (unremarkable study-normal kidneys, cysts bilaterally). Plaintiff stated that his hepatitis C condition affects him constantly on a daily basis, *id.* at 37, yet his condition was stable and he had no significant side effects from hepatitis treatment. *Id.* at 17, 293. Also, examinations consistently showed that Plaintiff's abdomen was soft and non-distended with no tenderness or guarding. *Id.* at 17, 278, 293, 321, 345, 350. Plaintiff was hospitalized in February 2008 and laboratory results showed elevated liver enzymes and high iron levels. *Id.* at 17, 277-79. By August 2009, his iron levels were significantly reduced and Plaintiff was described as "clinically asymptomatic." *Id.* at 17, 292. Plaintiff also testified that he was constantly tired and nauseated. *Id.* at 18, 40. Treatment notes do not reflect that Plaintiff made such complaints to his physicians or other health care providers. *Id.* at 18. In July 2008, Plaintiff specifically denied being fatigued. *Id.* at 18, 219.

Plaintiff testified that he could walk one-quarter of a mile and sit for several hours at a time. *Id.* at 18, 34. While Plaintiff alleged an inability to lift more than 15 pounds,

the record does not show any condition that would have caused such a limitation.  *Id.* at 18, 35. [7]

Although the ALJ may not reject the claims allegations of disability solely on the basis of objective medical evidence, the ALJ should consider objective evidence as one factor when determining an individual's credibility.  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  The objective medical evidence does not support Plaintiff's allegations of disability.  Overall, Plaintiff's physical examinations and clinical observations showed no significant functional limitations

The ALJ also noted that Plaintiff's treatment has been conservative.  R. 18, 200, 287, 293, 328, 388.  Allegations of disabling pain may be discounted because of inconsistencies such as conservative medical treatment.  *See generally* Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996).  Additionally, the treatment has been successful in controlling Plaintiff's symptoms.  R. 18.  At hearing, Plaintiff testified that the medication helped the symptoms.  *Id.* at 33.

The ALJ noted that Plaintiff "had a poor work history even prior to the alleged disability onset date."  *Id.* at 19.  Plaintiff argues that the ALJ erred in stating that he had a poor work history because he had earnings in "most years since 1977."  Doc. 18 at 17.  Although Plaintiff had earnings in "most years since 1977," those earnings rose

---

[7]  On December 10, 2009, Plaintiff was examined by Dr. Cottrell, a regularly scheduled 3-4 month visit.  *Id.* at 349.  Plaintiff stated "he's had some left-sided chest pain when he picked up a tire and I've reassured him that this is not due to his liver disease."  *Id.*  Plaintiff reported being seen at Capital two weeks ago for left-sided pain and that he had a cardiac evaluation.  *Id.*  On January 6, 2010, Nurse Practitioner Evans noted that Plaintiff was at Bond for evaluation and management of hepatitis C and hypertension.  Nurse Evans noted, in part: "Otherwise, he is complaining of a little pain in the upper abdomen.  He did admit to lifting a heavy tire and changing his tire.  No other complaints are offered at this time."  Diagnostic blood work was improved, normal, or essentially normal.  *Id.* at 391.

above $10,000 in only two years (1999 and 2001).  R. 128.  Additionally, there were

eight years between 1977 and 2008 (1986-1988, 1994, 1996, 2000, and 2004-2005) in

which Plaintiff posted no earnings and one year (1983) when he posted less than $10 in

earnings.  *Id.*  An ALJ may discount the claimant's credibility based upon his poor work

record and the ALJ did not err in this regard.  *See* Comstock v. Chater, 91 F.3d 1143,

1147 (8th Cir. 1996).

The totality of the inconsistencies noted by the ALJ provide substantial evidence

supporting the ALJ's decision that Plaintiff was not a credible witness.

## D.  Whether the ALJ's determination at Step Five that Plaintiff could perform work is supported by substantial evidence

Plaintiff argues that the ALJ erred in finding that he could perform other work

available in significant numbers in the national economy.  Doc. 18 at 18-19.

Specifically, Plaintiff argues that the ALJ should not have relied on the Medical-

Vocational Guidelines (the Grids), *see* 20 C.F.R. Part 404, Subpart P, Appendix 2,

because he had the nonexertional impairment of pain.  *Id.*[8]

---

[8]  The Grids are a series of matrices which correlate a set of variables--the
claimant's residual functional capacity (i.e., the ability, despite impairments, to do
sedentary, light, etc., work), age, educational background, and previous work
experience [including whether the previous work was skilled or unskilled].  Upon entry of
a set of these variables into the appropriate matrix a finding of disabled or not disabled
is rendered.  Gibson v. Heckler, 762 F.2d 1516, 1520 (11th Cir 1985).

In determining whether exclusive reliance on the Grids is appropriate, the ALJ
must first categorize the claimant's impairments as either exertional or non-exertional.
*See, e.g.,* Phillips, 357 F.3d at 1241-43.  Exertional impairments affect an individual's
ability to meet the seven strength demands of the job: sitting, standing, walking, lifting,
carrying, pushing, and pulling.  *Id.* at 1241 n.11.  Non-exertional impairments affect an
individual's ability to meet other work-related commands and include limitations such as
pain, medication side effects, and depression.  MacGregor, 786 F.2d at 1054.  An ALJ
may rely exclusively on the Grids when each factor used in the determination describes
the claimant situation, and when a case involves only exertional impairments.  Foote v.
Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).  In contrast, if the claimant has a non-

Plaintiff argues that his "pain and fatigue would affect his ability to work on a regular and continuing basis." Doc. 18 at 19. The argument continues that Plaintiff "has a significant nonexertional impairment which renders the application of the [Grids] inappropriate" and, as a result, "the ALJ erred by not obtaining the testimony of a vocational expert regarding whether Plaintiff could perform jobs in the national economy." *Id.*[9]

Mr. Capps testified during the hearing, albeit briefly and only opined that Plaintiff was unable to perform any past relevant work. He was not asked a hypothetical question regarding Plaintiff's ability to work in the future. R. 43-44. *See* n.10, *infra*.

As previously discussed, although Plaintiff claims to be in constant pain and also suffers from fatigue based on variety of causes, substantial evidence supports the ALJ's findings, rejecting the extent to which Plaintiff claimed to be impaired. In part, the ALJ considered Plaintiff's testimony regarding his lower extremity pain and his reported

exertional impairment that limits a wide range of work at a given level, an ALJ is required to consult a vocational expert. *Id.*

[9] Plaintiff has not alleged problems with concentration or any environmental or communicative limitations that would preclude the use of the Grids. *See* 20 C.F.R. §§ 404.1569a(c)(1)(i)-(vi), 416.969a(c)(1)(i)-(vi) (nonexertional limitations). During the hearing, the ALJ asked Plaintiff's counsel whether "there [is] any sort of a non-exertional impairment alleged here," and counsel responded, "No, Your Honor." *Id.* at 37. In Loudermilk v. Barnhart, 290 F.3d 1265, 1268 (11th Cir. 2001), the Eleventh Circuit cited to Sims v. Apfel, 530 U.S. 103 (2000), in a footnote, and stated that "[t]he Supreme Court has held that a Social Security claimant's failure to raise an issue at the administrative level does not deprive a court of jurisdiction to consider the issue when it is raised for the first time during judicial proceedings." *Id.* at 1268 n.1. *See also* Hall v. Astrue, 2010 U.S. Dist. LEXIS 129441, *25-27 (M.D. Fla. Dec. 7, 2010) (At Step Five, "[a] claimant does not have to cross-examine the 'VE' or rebut his responses."). *But see* Bechtold v. Massanari, 152 F. Supp. 2d 1340, 1347 (M.D. Fla. 2001) (finding, in a social security case, claimant waived her argument by failing to raise it before the ALJ), *aff'd sub nom*, Bechtold v. Barnhart, 31 F. App'x 202 (11th Cir. 2001) (table). The Commissioner does not argue waiver and no determination is made whether counsel's response is a waiver.

history of migraine headaches. R. 17-18. (Plaintiff testified that his pain caused him trouble with lifting, standing, and walking, which are exertional activities. *See* 20 C.F.R. §§ 404.1569a(b), 416.969a(b) (exertional limitations). The ALJ found that Plaintiff's "description of the symptoms and limitations that [he] provided throughout the record has generally been inconsistent and unpersuasive." R. 18. The ALJ concluded that the objective evidence, that is, medical records, including longitudinal examination and treatment notes, did not corroborate Plaintiff's allegations such that Plaintiff is precluded from performing a full range of medium exertional work activity. R. 18-19.

When impairments and related symptoms only impose exertional limitations and the claimant's specific vocational profile is listed in a rule contained in the Grids, the Commissioner directly applies that rule to decide whether the claimant is disabled. *See* 20 C.F.R. §§ 404.1569a(b), 416.969a(b). Plaintiff had no proven nonexertional limitations in his ability to perform medium work. Thus, the ALJ properly relied on the Grids and ultimately did not err in relying on Medical-Vocational Rule 203.22 (Table No. 3) when he concluded that Plaintiff is not disabled. R. 20.

## VI. Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge are based upon substantial evidence and he correctly followed the law. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's applications for Social Security benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on October 29, 2012.

> **s/ Charles A. Stampelos**
> **CHARLES A. STAMPELOS**
> **UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.